**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 5:25-cr-00116 |
| | : | |
| SAUL CONTRERAS-ALBALADEJO, | : | |
| Defendant. | : | |

**O P I N I O N**
**Defendant's Motion to Suppress, ECF No. 19 - Denied**

**Joseph F. Leeson, Jr.**                                              **March 24, 2026**
**United States District Judge**

## I.      INTRODUCTION

Defendant Saul Contreras-Albaladejo is charged with possession with intent to distribute

cocaine base ("crack"), methamphetamine, fentanyl, and cocaine, in violation of 21 U.S.C. §§

841(a)(1), (b)(1)(A), (b)(1)(B), and (b)(1)(C), and with possession of a firearm in furtherance of

drug trafficking, in violation of 18 U.S.C. § 924(c)(1). Contreras-Albaladejo has filed a Motion

to Suppress, as fruits of the poisonous tree, all physical evidence obtained after an allegedly

unlawful traffic stop on August 2, 2024. The Court held an evidentiary hearing on the Motion on

December 16, 2025. For the reasons set forth herein, Contreras-Albaladejo's Motion to Suppress

is denied.

## II.    FINDINGS OF FACT[1]

1.    Officer Tyler Chubb, a member of the Selective Enforcement Unit of the Lancaster City Bureau of Police in Lancaster, Pennsylvania, who has been in law enforcement since 2012, testified at the evidentiary hearing on December 16, 2025.

2.    The testimony of Officer Chubb is credible and accepted as fact.[2]

3.    Officer Brian Coyt, who has been a patrol officer with the Lancaster City Bureau of Police for six years, testified at the evidentiary hearing on December 16, 2025.

4.    The testimony of Officer Coyt is credible and accepted as fact.[3]

5.    Officer Alexander Hartman, who has been a patrol officer with the Lancaster City Bureau of Police since 2021, testified at the evidentiary hearing on December 16, 2025.

6.    The testimony of Officer Hartman is credible and accepted as fact.[4]

7.    Detective Timothy Sinnott, now a patrol sergeant with the Lancaster City Bureau of Police, who has been with the Lancaster City Bureau of Police since 2014, testified at the evidentiary hearing on December 16, 2025.

---

[1]    The findings of fact are largely adopted from the proposed findings of fact submitted by the parties. *See* ECF Nos. 32, 33.

[2]    The Court makes this determination after having listened to the testimony of Officer Chubb and having viewed his demeanor. The Court finds, *inter alia*, that Officer Chubb had a good recollection of the events, his account was believable, and his testimony was consistent throughout and was confirmed by other evidence. Additionally, no evidence was offered to rebut Officer Chubb's testimony.

[3]    The Court makes this determination after having listened to the testimony of Officer Coyt and having viewed his demeanor. The Court finds, *inter alia*, that Officer Coyt had a good recollection of the events, his account was believable, and his testimony was consistent throughout and was confirmed by other evidence. Additionally, no evidence was offered to rebut Officer Coyt's testimony.

[4]    The Court makes this determination after having listened to the testimony of Officer Hartman and having viewed his demeanor. The Court finds, *inter alia*, that Officer Hartman had a good recollection of the events, his account was believable, and his testimony was consistent throughout and was confirmed by other evidence. Additionally, no evidence was offered to rebut Officer Hartman's testimony.

8.      The testimony of Detective Sinnott is credible and accepted as fact.[5]

9.      On July 10, 2024, Officer Chubb was working in his capacity as a member of the Selective Enforcement Unit to conduct a "buy/walk operation."[6] *See* Transcript of Evidentiary Hearing at 18:9-22, 20:9-15, Dec. 16, 2025, (hereinafter "Tr. __"), ECF No. 30.

10.     Officer Chubb, as the primary case officer,[7] monitored the radio for the surveillance officers and the wire on the undercover officer ("UC"). Tr. 19:5–20:3.

11.     During the operation, the UC attempted to procure illegal narcotics from a "middleman," a known narcotics user who had previously procured narcotics for the UC. Tr. 20:20–22:2.

12.     The middleman called an unknown man to arrange the sale of narcotics. Tr. 21:22–22:10.

13.     The middleman, the UC, and the unknown man agreed to meet at the Turkey Hill Mini Mart located at 460 S. Duke Street, Lancaster, Pennsylvania at 5:00 P.M. Tr. 22:7-13.

14.     The unknown man arrived at 5:00 P.M. in a maroon 2009 Nissan Murano SUV, bearing a Pennsylvania license plate with the number MCW-7686. Tr. 22:12-13, 23:7–25:16.

15.     The unknown man was the sole occupant of the Nissan Murano. Tr. 27:21-23.

16.     After receiving "buy money" which is "a predetermined, [sic] quantity of U.S. currency," from the UC, the middleman exited the UC's vehicle, got into the front passenger seat of the Nissan Murano, then returned to the UC's vehicle less than a minute later. Tr. 27:14–28:24.

---

[5]      The Court makes this determination after having listened to the testimony of Detective Sinnott and having viewed his demeanor. The Court finds, *inter alia*, that Detective Sinnott had a good recollection of the events, his account was believable, and his testimony was consistent throughout and was confirmed by other evidence. Additionally, no evidence was offered to rebut Detective Sinnott's testimony.

[6]      A "buy/walk operation" is when police utilize an undercover officer to conduct a purchase of illegal narcotics, but not arrest the dealer or middleman if they are able to identify who the dealer or middleman is and, instead, continue the investigation. Tr. 18:14-22.

[7]      The primary officer "is the officer that is [often voluntarily] chosen for the day" who provides primary surveillance for the undercover officer. Tr. 19:7-10.

17.     The middleman handed the UC numerous pink clear plastic cylindrical vials each containing cocaine base (also known as "crack cocaine"), which the Pennsylvania State Police lab confirmed. Tr. 29:3-5, 29:14-17.

18.     The UC then sent a text message to the officers to let them know that the drug deal was complete. Tr. 28:3-5.

19.     Sergeant Fleury, with the Lancaster City Bureau of Police, took photographs of the unknown male and the Nissan Murano during the incident. Tr. 31:1-11, *see also* Gov't Exs. 4-1, 4-2.

20.     After the UC drove off, the unknown male went inside the Turkey Hill, which the surveilling officers photographed. Tr. 31:2-5.

21.     The unknown male then left the Turkey Hill, got into the Nissan Murano, and drove off. Tr. 32:15–33:17.

22.     Surveillance officers followed the Nissan Murano for several blocks after it exited the Turkey Hill parking lot, then notified one of the marked patrol units to stop the vehicle. Tr. 33:14-19.

23.     A marked patrol unit activated its lights and sirens and momentarily stopped the Nissan Murano, but when one of the patrol officers got out of the marked unit, the Nissan Murano fled from the scene. Tr. 33:18-23, 54:16-25.

24.     A police chase of the Nissan Murano ensued, which Officer Coyt, who was on patrol, joined as the second police cruiser in the pursuit. Tr. 54:24-25, 81:1-2, 85:9–86:1.

25.     During the pursuit, Officer Coyt saw all the digits of the license plate number of the Nissan Murano, but the driver "got away," and Officer Coyt did not see the driver of the Nissan Murano. Tr. 81:3-4, 86:2-13.

26.     Later that day, officers, including Officer Coyt, located the Nissan Murano unoccupied and parked on the street in Lancaster City. Tr. 34:21–36:16, 81:10–82:3, 82:20-24.

27.     Officer Coyt had the Nissan Murano towed to the police lot and secured while a search warrant was obtained. Tr. 83:1-5.

28.     The following day, Officer Chubb searched the Nissan Murano without a warrant and found the same pink vials of crack cocaine that were sold to the UC, a bundle of heroin, and other drug paraphernalia. Tr. 35:19–36:10, 43:6-13, 83:7.

29.     Police then released the Nissan Murano to its registered owner, Jose Diaz-Munoz. Tr. 36:20–37:20, 43:18-21, 83:10-84:17.

30.     Approximately three weeks later, on August 2, 2024, around 8:00 p.m., Officers Hartman and Coyt were on patrol in the 300 block of S. Queen Street in the city of Lancaster when they saw the driver of a maroon Nissan Murano, having a "loud discussion[]" with someone walking on the sidewalk. Tr. 54:1-13, 86:20–87:17, 88:19-25, 106:8-15.

31.     The 300 block of S. Queen Street is "one of the . . . higher drug-trafficking areas in Lancaster City." Tr. 148:4-21, 155:8-10.

32.     Officer Coyt recognized the Nissan Murano and its license plate as matching the vehicle involved in a vehicle pursuant the prior month. Tr. 54:14–55:7.

33.     As the Officers pulled up behind the Nissan Murano, the Nissan Murano drove through a steady red traffic signal at the intersection of Conestoga, South Queen, and Church Streets. Tr. 55:12–56:10, 90:11-19, 106:8-15.

34.     Officers Coyt and Hartman ran the Nissan Murano's license plate through MobileCop,[8] which confirmed that the vehicle was the same from the July 10, 2024 police chase. Tr. 56:11-19, 91:1-20, 106:18-22, 117:14-21.

35.     The Officers activated their patrol vehicle's lights and siren to pull over the Nissan Murano. Tr. 57:3-20, 94:4-6, 106:23–107:6.

36.     At this time, Officer Coyt's body-worn camera footage started. Tr. 69:1-2.

37.     The body-worn camera footage of all three Officers is consistent with the Officers' testimony as described herein. *See* Ex. G-1 (Officer Coyt's body-worn camera footage); Ex. G-2 (Officer Hartman's body-worn camera footage); Ex. G-3 (Detective Sinnott's body-worn camera footage).

38.     The driver pulled over very close to vehicles parked on the left side of the street in the 100 block of S. Queen Street, which did not leave room for the Officers to approach the driver's side of the Nissan Murano. Tr. 57:22–58:8, 107:9-19, 135:2-22.

39.     Detective Sinnott, who was on patrol in the 300 block of Queen Street and observed the traffic stop, drove behind Officers Hartman and Coyt in his own vehicle. Tr. 92:17-25, 108:18-22, 133:8–134:21.

40.     Two other Lancaster City police officers, Officer Strouser and Officer Rodriguez, later arrived on scene. Tr. 108:24–109:1.

41.     Officer Coyt approached the passenger side of the Nissan Murano, while Officer Hartman tried to approach on the driver's side, but was unable to safely do so because it was too tight. Tr. 58:19-25.

---

[8]     MobileCop is a software used by law enforcement, including the Lancaster City Police, where officers can check driver's licenses and license plates. Tr. 40:21-41:24.

42. Although it was a tight fit, Detective Sinnott approached the driver's side. Tr. 64:9-17, 135:7-22.

43. There were two people in the Nissan Murano: a male driver (Contreras-Albaladejo) and a female passenger ("Y.A.P."). Tr. 59:8.

44. Officer Coyt asked Contreras-Albaladejo and Y.A.P. for their respective licenses, registration, and identification, but they could not produce them. Tr. 60:2-17, 69:5-10, 69:18-21.

45. Contreras-Albaladejo and Y.A.P. gave Officer Coyt their names and dates of birth. Tr. 60:16-18.

46. Detective Sinnott and Officer Hartman noticed that Contreras-Albaladejo still had the car in "Drive," which was concerning to them because of the risk of flight, and alerted Officer Coyt, who was speaking in Spanish to Contreras-Albaladejo and Y.A.P. from the passenger side of the vehicle. Tr. 59:9-21, 62:20–63:25, 70:9-20, 109:2–110:2, 136:11–137:6.

47. Officer Coyt advised Contreras-Albaladejo, who was reaching for the door handle and gear stick, to place the gear in "Park," turn the vehicle off, and put the keys on top of the dashboard. Tr. 70:2-18, 97:6-16, 102:13-21; Ex. G-1. Contreras-Albaladejo complied, although he briefly turned the car back on to roll down the window. Tr. 70:19-20, 71:20-22, 97:6-16, 102:13-21.

48. Officer Coyt testified that drivers involved in traffic stops were "sometimes" nervous and forget to turn off the vehicle. Tr. 70:15-18.

49. Officer Coyt also testified that people acted nervously when there was "more going on than just a regular traffic stop." Tr. 63:17-19.

50. Officer Coyt generally performs one hundred traffic stops per year. Tr. 58:14-15.

51.    Officer Coyt returned to his police vehicle to run a search of Contreras-Albaladejo and Y.A.P.'s names and dates of birth. Tr. 61:10–62:17, 69:18-21.

52.    On his way, Officer Coyt told Detective Sinnott that he believed that Contreras-Albaladejo was the suspect who fled from police in July 2024, and that there were photographs of the suspect. Tr. 64:9-17, 71:2-14; Ex. G-1.

53.    This exchange lasted ninety seconds. Tr. 71:2-14; Ex. G-1.

54.    When running the name and date of birth search, Officer Coyt learned that Y.A.P. faced prior criminal charges, such as narcotics possession with intent to distribute. Tr. 62:4-8, 72:3-23.

55.    While Officer Coyt searched Contreras-Albaladejo's and Y.A.P.'s records, Detective Sinnott asked Officer Hartman to "swap[] out" with him so that he could contact members of the Selective Enforcement Unit. Tr. 110:7-19, 139:5-20.

56.    Over the course of approximately three minutes, while Officer Coyt performed the record search, Detective Sinnott contacted Officer Andrew Schaefer of the Selective Enforcement Unit and received two photographs of the suspect in the July 2024 narcotics offense. Tr. 139:15–141:23, 143:10-13; *see also* Gov't Exs. 4-1, 4-2 (providing the photographs of the unknown man in the July 2024 narcotics offense).

57.    Detective Sinnott determined that the suspect in the photograph and the driver, Contreras-Albaladejo, were the same person. Tr. 141:17–142:12.

58.    Detective Sinnott told Officer Hartman that they would remove Contreras-Albaladejo from the vehicle to take a photograph of Contreras-Albaladejo and send it to the Selective Enforcement Unit "for them to verify the identity" and determine whether Contreras-Albaladejo was the suspect from the July 2024 narcotics offense. Tr. 110:23-24, 142:18-23.

59.     Approximately eight minutes after the traffic stop began, Officer Hartman ordered Contreras-Albaladejo to exit the vehicle. Tr. 73:11-17, 110:25–111:7; Ex. G-1.

60.     Officer Hartman testified it was procedure whenever they had an occupant get out of a vehicle to have the person interlace their fingers and place them on top of their heads so that the officer "can gain control of their hands and safely escort them out of the vehicle." Tr. 111:3-7.

61.     Contreras-Albaladejo initially complied with the order by placing his hands up, but then "tried to shut the driver's door" on Officer Hartman. Tr. 111:10-13, 122:3–124:20.

62.     When Officer Hartman attempted to open the driver's side door, Contreras-Albaladejo reached toward the door and tried to close it. Tr. 111:8-19.

63.     Officer Hartman testified that he opened the Nissan Murano's door, but Contreras-Albaladejo "was pulling in the opposite direction" from the Officers. Tr. 111:21–112:15.

64.     Officer Hartman "gain[ed] control" of Contreras-Albaladejo's arm and removed him from the Nissan Murano. Tr. 111:21–112:6.

65.     Once out of the car, Contreras-Albaladejo continued to resist the Officers by pulling his arms away from them as they tried to handcuff him, but Officers eventually restrained Contreras-Albaladejo and placed him in handcuffs. Tr. 65:17–66:16, 112:12-19, 127:11-15, 144:13-17.

66.     Upon handcuffing Contreras-Albaladejo, Officers had confirmed in their minds that he was the suspect from the July 2024 narcotics offense.[9] Tr. 66:13-21, 125:7-11.

67.     Detective Sinnott testified that persons involved in narcotics offenses often carry weapons to protect themselves. Tr. 132:16–133:7.

68.     Detective Sinnott had conducted hundreds of narcotics arrests. Tr. 131:22–132:9.

---

[9]     The arrest occurred approximately ten minutes after the stop began, according to Officer Hartman's and Officer Coyt's dashboard camera video. Tr. 79:22–80:3; Ex. D-1.

69.     After handcuffing Contreras-Albaladejo, Officer Hartman searched Contreras-Albaladejo's person and recovered a handgun from the left front pocket of his shorts. Tr. 66:7–67:12, 76:17-19, 113:2-7, 115:15–116:7, 124:25–125:2, 129:1-11; *see also* Ex. D-1 (dashboard camera video).

70.     In the right pocket of Contreras-Albaladejo's shorts, the Officers found 70 individual pink containers, called "trash cans," containing suspected crack cocaine, as well as a clear plastic pocket filled with alleged narcotics, and U.S. currency. Tr. 66:19-21, 113:6-7, 115:22-25.

71.     In response to questions from Contreras-Albaladejo during the search, the Officers informed him that the Nissan Murano would be towed. Tr. 76:24–77:2.

## III.   LEGAL STANDARDS

### A.   Motion to Suppress – Review of Applicable Law

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Id.* (citation omitted).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The initial step of a Fourth Amendment suppression analysis requires [the court] to determine the timing of the seizure." *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008).

### B.   Traffic Stops

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."

*Illinois v. Wardlow*, 534 U.S. 266, 123 (2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). *See also Kansas v. Glover*, 589 U.S. 376, 380 (2020) ("[T]he Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" (citing *United States v. Cortez*, 449 U.S. 411, 417–418 (1981))). "Reasonable suspicion" is a "less demanding standard" than probable cause, but "the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123 ("The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity." (quoting *Terry*, 392 U.S. at 27)). "The test is one of reasonableness given the totality of the circumstances, which can include [a person's] location, a history of crime in the area, [a person's] nervous behavior and evasiveness, and the officer's 'commonsense judgments and inferences about human behavior.'" *Johnson v. Campbell*, 332 F. 3d 199, 206 (3d Cir. 2003) (quoting *Wardlow*, 528 U.S. at 124–25). "Though the individual factors giving rise to reasonable suspicion may be innocent in isolation, together they must serve to eliminate a substantial portion of innocent travelers." *United States v. Mathurin*, 561 F.3d 170, 174 (3d Cir. 2009) (citation omitted). When considering the "totality of the circumstances" confronting police, individual factors "readily susceptible to an innocent explanation" may collectively amount to reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citation omitted).

### C.    Duration of Traffic Stops

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citations omitted). "To lawfully extend a stop beyond when tasks tied to its initial mission are completed

or reasonably should have been completed, an officer must have an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring." *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) (citing *Rodriguez*, 575 U.S. at 355). The ordinary tasks of a traffic stop "include 'checking the driver's license, determining whether there are outstanding warrants against the drier, and inspecting the automobile's registration and proof of insurance.'" *Id.* During a traffic stop, an officer may make unrelated inquires so long as these tasks do not "lengthen" or "prolong" the roadside detention. *Rodriguez*, 575 U.S. at 354–55.

The reviewing court must first decide whether and when the stop was "measurably extended" and then determine whether the extension was justified by reasonable suspicion of criminal activity. *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (citations omitted).

### D.      Protective Searches

The United States Supreme Court has recognized that "roadside encounters between police and suspects are especially hazardous." *United States v. Jackson*, 120 F.4th 1210, 1220 (3d Cir. 2024), *cert. denied*, 145 S. Ct. 2827 (2025) (citing *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)). "An officer who approaches a suspicious vehicle has no way of knowing who or what he will find behind the wheel and necessarily exposes himself to a danger of attack." *Jackson*, 120 F.4th at 1220 (citing *United States v. Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997) ("The Supreme Court has repeatedly recognized that traffic stops are dangerous encounters that result in assaults and murders of police officers.")). Any "danger is likely to be greater when there are passengers in addition to the driver in the stopped car." *Jackson*, 120 F.4th at 1120 (citing *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)). Thus, "an officer conducting an investigative stop may take 'necessary measures' to 'assure himself that the person with whom

he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.'" *Jackson*, 120 F.4th at 1120 (citing *Johnson*, 592 F.3d at 452).

In *Arizona v. Johnson*, the United States Supreme Court held that:

> To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous.

555 U.S. 323, 327 (2009). A patdown search "must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (citing *Terry*, 392 U.S. at 26). In determining whether a suspect is likely armed and dangerous, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (quoting *Cortez*, 449 U.S. at 418). Courts "give considerable deference to police officers' determinations of reasonable suspicion." *United States v. Brown*, 765 F.3d 278, 290 (3d Cir. 2014) (citation omitted).

Courts reviewing pat down searches consider "the overall reasonableness of conduct in light of all the circumstances." *Johnson*, 592 F.3d at 452 (citations omitted). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.

### E.      Exceptions to Exclusionary Rule – Review of Applicable Law

Although courts are generally required to exclude unlawfully seized evidence (exclusionary rule), including both direct and derivative evidence, "suppression of evidence" is always a "last resort." *Utah v. Strieff*, 579 U.S. 232, 237–38 (2016). Thus, the Supreme Court has

recognized several exceptions to the exclusionary rule: (1) the independent source doctrine, which "allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source," (2) the inevitable discovery doctrine, which "allows for the admission of evidence that would have been discovered even without the unconstitutional source," and (3) the attenuation doctrine, wherein "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *Id.* at 238.

## IV.    CONCLUSIONS OF LAW

### A.    The traffic stop was lawful.

The parties do not dispute that Contreras-Albaladejo was seized during the traffic stop on August 2, 2024. *See* Gov't Conclusions of Law ("COL") ¶¶ 4, 8, ECF No. 33; Def. Conclusions of Law ("COL") ¶¶ 1–4, ECF No. 32. The question before the Court is whether the stop was reasonable. *See United States v. Hunter*, 88 F.4th 221, 224 (3d Cir. 2023) (holding that a traffic stop "is subject to review for reasonableness" (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996))). The Court finds that the stop was reasonable for two reasons: first, Officers Coyt and Hartman saw the Nissan Murano drive through a red light, and second, the Officers had reasonable suspicion that the Nissan Murano was the same vehicle as involved in the July 2024 police chase following a narcotics offense.

First, the Officers observed the Nissan Murano drive through a steady red traffic signal in violation of Pennsylvania traffic laws. *See* 75 Pa. C.S. § 3112(a)(3) (providing that "[v]ehicular traffic facing a steady red signal alone shall stop . . . and shall remain standing until an indication to proceed is shown"). "[W]here a police officer observes a violation of state traffic regulations," a traffic stop is lawful under the Fourth Amendment. *Moorefield*, 111 F.3d at 12 (citing

14
032426

*Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (holding that a traffic stop is lawful under the Fourth Amendment where a police officer observes a state traffic violation)); *see also United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) (same).

Second, the Officers had reasonable suspicion to believe that the Nissan Murano was involved in the July 2024 police chase following a narcotics offense. Officer Coyt, who had taken part in the July 2024 police chase, remembered the license plate on the Nissan Murano from July 10, 2024, and saw the same plate on the Nissan Murano on August 2, 2024. Officers Coyt and Hartman ran the Nissan Murano's license plate through MobileCop and confirmed that it was the same license plate and vehicle as the vehicle used in the July 2024 police chase. Hence, the Officers had "a particularized and objective basis for suspecting [the driver of the Nissan Murano] of criminal activity" *Glover*, 589 U.S. at 380; *Arvizu*, 534 U.S. at 273–74 (holding that the reasonable suspicion determination "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person"); *United States v. Lewis*, 711 F. Supp. 3d 444, 457 (E.D. Pa. 2024) (finding that a police officer had reasonable suspicion to stop a vehicle that matched the make, color, and model year of a vehicle used in a prior robbery).

**B.    The duration of the traffic stop was lawful.**

Here, the approximately three minutes that it took Officer Coyt to run the Nissan Murano's license plates and confirm Contreras-Albaladejo's and Y.A.P.'s identities did not measurably extend the stop. Rather, Officer Coyt's review of both Contreras-Albaladejo's and Y.A.P.'s names and dates of birth was a necessary part of a traffic stop and did not trigger a *Rodriguez* moment. *See Rodriguez*, 575 U.S. at 354–55 (holding that checking a driver's records

is part of a traffic stop's ordinary mission); *see also United States v. Ross*, No. 21-200, 2022 WL 16963247, at *4 (E.D. Pa. Nov. 16, 2022) (finding that running a records check of the driver's name and date of birth, when the driver did not produce a driver's license, "was a necessary part of the traffic stop" that did not unreasonably extend the stop), *United States v. Williams*, No. 22-418, 2023 WL 6626126, at *12 (E.D. Pa. Oct. 11, 2023) (finding that a record search was a "necessary step in confirming [the defendant's] identity and ensuring the officers' safety[]").

In addition, because Contreras-Albaladejo could not produce his driver's license, the Officers did not measurably extend the stop by asking for identification from Contreras-Albaladejo and Y.A.P. *See United States v. Morris*, No. 20-263, 2023 WL 5607970, at *7 (W.D. Pa. Aug. 30, 2023) ("Because [the officer] was unable to complete the mission of the stop due to the [driver's failure to present the vehicle's registration and the driver providing false information], [the officer] did not measurably extend the stop by requesting the passengers' IDs or running their information through a database."). That Contreras-Albaladejo could not produce his driver's license meant that he could not drive away. Rather, he would need to wait until either a licensed driver came to get him or a tow truck arrived to tow the vehicle. It is unclear how long it would have taken for either to occur. Any additional time thus did not measurably extend the stop. *See United States v. Burrus*, 402 F. Supp. 3d 116, 124 (W.D. Pa. 2019) (finding that "the traffic stop was not finished because Officer Hess could not permit any of the occupants to drive the vehicle away from the scene without further investigation" and would require either a licensed driver or a tow truck to pick up the vehicle).

The Officers' investigation into Contreras-Albaladejo as the possible suspect of the July 2024 police chase and narcotics offense did not extend the stop. Rather, the investigation of the vehicle as having been involved in a police chase and into whether Contreras-Albaladejo was the

16
032426

suspect in the July 2024 narcotics offense was *one of* the Officers' reasons for stopping the Nissan Murano. As previously found, the Officers had reasonable suspicion at the time of the stop to believe that the Nissan Murano had been involved in the July 2024 narcotics offense and subsequent police chase. Detective Sinnott contacted the Selective Enforcement Unit during the three minutes that Officer Coyt performed the record search. Within those three minutes, Detective Sinnott obtained two photographs of the suspect in the July 2024 narcotics offense to compare to Contreras-Albaladejo; thus, his actions did not extend the stop. *See Rodriguez*, 575 U.S. at 354 (considering the mission of a traffic stop).

Detective Sinnott's investigation produced reasonable suspicion, at a minimum, for the Officers to continue investigating Contreras-Albaladejo's involvement in the July 2024 narcotics offense and police chase. *See United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) ("[A]n officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation."); *Ross*, 2022 WL 16963247, at \*2, \*4 (finding that an officer's five-to-seven-minute phone call about a driver's prior criminal offense did not measurably extend the stop); *Williams*, 2023 WL 6626126, at \*12 (finding that an officer's conversation about how the driver of the vehicle was on federal probation, which occurred while waiting for another officer to perform a record search, did not measurably extend the stop). The Officers were therefore justified[10] in ordering Contreras-Albaladejo out of the Nissan Murano to take a picture of him to

---

[10]    Even without reasonable suspicion, the Officers could have ordered Contreras-Albaladejo out of the vehicle. *See Mimms*, 434 U.S. at 111 n.6 ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.").

compare him to the suspect in the July 2024 narcotics offense. Doing so did not unreasonably extend the stop.

### C.      The search of Contreras-Albaladejo was lawful.

The Officers' search of Contreras-Albaladejo following his removal from the Nissan Murano was also lawful. When the Officers lawfully removed Contreras-Albaladejo from the Nissan Murano, they had reasonable suspicion to search him. The facts giving rise to the Officers' reasonable suspicion included[11]: (1) Contreras-Albaladejo drove a maroon Nissan Murano with the same license plate as the vehicle used in the July 2024 police chase and narcotics offense; (2) Contreras-Albaladejo presented nervous behavior, such as grabbing the gear stick;[12] (3) Contreras-Albaladejo resisted exiting the vehicle; (4) Contreras-Albaladejo continued to resist once the Officers removed him from the vehicle; (5) the Officers believed that Contreras-Albaladejo was the same person involved in the July 2024 narcotics offense and police chase; and (6) Detective Sinnott testified that suspects in narcotic offenses often carry weapons. The Court considers relevant the Officers' experience and training involving traffic stops and narcotics offenses, as well as their knowledge of the area where the stop occurred as a high narcotics-trafficking area.[13] In their totality, these "specific and articulable facts" led the Officers "to conclude . . . that criminal activity may [have been] afoot and that [Contreras-Albaladejo] may [have been] armed and presently dangerous." *Terry*, 392 U.S. at 21, 30; *Long*, 463 U.S. at

---

[11]      Not all the facts described herein are required to create reasonable suspicion.

[12]      "[N]ervous, evasive behavior is another pertinent factor in determining reasonable suspicion[.]" *Wardlow*, 528 U.S. at 124.

[13]      "[T]he fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Wardlow*, 528 U.S. at 124 (citation omitted). Yet, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Id.* (citation omitted).

1049; *see also United States v. Anderson*, 859 F.2d 1171, 1177 (3d Cir. 1988) (crediting a police officer's contention that persons involved with drug trafficking "often carry weapons"); *United States v. Sanchez*, 398 F. App'x 840, 843 (3d Cir. 2010) ("Given that drug traffickers often carry weapons and reasonable suspicion existed that the [a]ppellants were drug dealers, the troopers reasonably suspected that both [a]ppellants were armed and dangerous, justifying the minimally invasive search.").

Furthermore, when Contreras-Albaladejo resisted the Officers, the Officers had probable cause to arrest him. The Officers could then perform a search of Contreras-Albaladejo's person incident to a lawful arrest. *See Chimel v. California*, 395 U.S. 752, 763 (1969) (holding that a police officer may conduct "a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence").

Accordingly, for the reasons discussed, there was no violation of Contreras-Albaladejo's Fourth Amendment rights.

## V.       CONCLUSION

The traffic stop and search of Contreras-Albaladejo were lawful. First, the August 2, 2024 traffic stop was lawful because the Officers observed Contreras-Albaladejo drive through a steady red traffic signal in a vehicle of the same make, model, and color, and with the same license plate as the vehicle involved in the July 2024 police chase. Second, the Officers' investigation into whether Contreras-Albaladejo was the suspect in the July 2024 narcotics offense and police chase did not measurably extend the stop. The officers had reasonable suspicion to investigate his involvement in the July 2024 narcotics offense and police chase. Third, the search of Contreras-Albaladejo was lawful and supported by both reasonable

suspicion and probable cause. For the aforementioned reasons, the Court denies Contreras-Albaladejo's Motion to Suppress.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge